# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| EDWIN E. PEACOCK, individually and as Administrator on behalf of the Estate of BLAKE PEACOCK, deceased; and SHEILA PEACOCK, individually, <br><br> *Plaintiffs*, <br><br> v. <br><br> Lieutenant CHRISTOPHER SMITH; and Sergeant ROBERT HOGAN, in their individual capacities as Deputies of the Bleckley County Sheriff, <br><br> *Defendants*. | CIVIL ACTION NO. 5:18-cv-00284-TES |

## ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Plaintiff Edwin E. Peacock, individually and as Administrator of the estate of the decedent, Blake Peacock ("Peacock"), and Plaintiff Sheila Peacock, individually (collectively "Plaintiffs") filed a lawsuit under 42 U.S.C. § 1983 [Doc. 1-1, at pp. 6-13] in the Superior Court of Bleckley County, Georgia, against Defendants, Bleckley County Deputy Sheriffs Lieutenant Christopher Smith and Sergeant Robert Hogan, alleging they violated Peacock's rights under federal law and the Constitution of the United States. [*Id.* at p. 8, ¶ 10].

On July 3, 2018, Defendants (with Plaintiffs' consent) timely removed the case to this court pursuant to 28 U.S.C. § 1441(a). The Defendants then filed a Motion for Judgment on the Pleadings [Doc. 5] pursuant to Federal Rule of Civil Procedure Rule 12(c). Having read and considered the parties' arguments, the Court **GRANTS** Defendants' motion for the following reasons.

## FACTUAL BACKGROUND

The Court takes the following facts from Plaintiffs' Complaint [Doc. 1-1, at pp. 6-13], which it accepts as true, and Defendants' Answer [Doc. 3].[1] *See Douglas Asphalt Co. v. Qore, Inc.*, 541 F. 3d 1269, 1273 (11th Cir. 2008). For purposes of ruling on Defendants' motion, the Court views these facts in the light most favorable to Plaintiffs as the nonmoving parties. *Id.*

While on patrol on the morning of June 27, 2016, Lt. Smith and Sgt. Hogan, deputies with the Bleckley County Sheriff's Office, received a domestic dispute call at a

---

[1] Plaintiffs have specifically referenced the Body Cam Video (with sound) in their Complaint [Doc. 1-1, at pp. 9-10, ¶¶ 19, 24], and Defendants filed the body camera footage contemporaneously with their Answer [Doc 3]; *see also* [Doc. 4, Notice of Conventional Filing, Oct. 10, 2018]. "[I]f an attachment to an answer is a 'written instrument,' it is part of the pleadings and can be considered on a Rule 12(c) motion for judgment on the pleadings without the motion being converted to one for summary judgment." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). Furthermore, "the court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, 'undisputed' means that the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Therefore, the Court has considered the video footage in addition to the parties' pleadings. *See* [Docs. 1-1, at pp. 6-13; 3]. For consistency reasons, the Court's citations to the Body Cam Video, like the parties', are to the timestamp on the video itself.

residence located on Highway 257 in Cochran, Bleckley County, Georgia. [Doc. 1-1, at pp. 7-8, ¶¶ 7-8; pp. 8-9, ¶¶ 11, 14]. As the two deputies responded to the call, the 911 dispatcher advised them that the "subject," later identified as Peacock, "had a weapon." [*Id.* at p. 9, ¶¶ 15-16]. Once they arrived at the residence, Lt. Smith directed Sgt. Hogan to "radio 911 and request backup." [*Id.* at ¶ 17].

Rather than await the arrival of the requested backup, Lt. Smith,[2] armed with his "personal AR-15 style rifle,"[3] entered the property. [*Id.* at ¶ 18]. Shortly after doing so, he encountered Peacock, who, as previously reported, was armed. [*Id.* at p. 10, ¶ 20]; *see also* [Doc. 4, at 8:35.02].[4] Lieutenant Smith gave Peacock two back-to-back commands to drop his weapon. [Doc. 4, at 8:33.10-8:33.14]. Rather than complying with Lt. Smith's commands, Peacock—still armed—continued to walk toward Lt. Smith. [Doc. 1-1, at p. 10, ¶ 21]. When Peacock refused to drop his weapon and continued to approach Lt. Smith, he shot Peacock in the chest. [*Id.*]; *see also* [Doc. 4, at 8:33.15].

Eight seconds after Lt. Smith's shot, Sgt. Hogan called for Emergency Medical Services ("EMS"). [Doc. 1-1, at p. 10; ¶ 22]; *see also* [Doc. 4, at 8:33.23-8:33.26]. Although

---

[2] Sergeant Hogan was equipped with a shoulder microphone and body camera, but Lt. Smith was not. [Doc. 1-1, at p. 9; ¶ 19].

[3] The weapon is more specifically described as a "black in color Bushmaster 223-5.56 caliber rifle (serial number: BFI617605)." [Doc. 1-1, at p. 9; ¶ 18].

[4] While this timestamp is *after* Lt. Smith's shot, it is the first visual of the weapon that Peacock brandished.

Sgt. Hogan repeatedly called for EMS, Defendants never personally attempted to render medical aid *themselves*; rather, they waited for professional medical assistance to arrive. *See generally* [Doc. 4]. When EMS arrived at the property, they detected a slight pulse in Peacock; however, he died shortly after. [Doc. 1-1, at p. 10, ¶ 26].

The following chart is a timeline of events that morning:

| 8:31.59 | Body Cam Video begins. Officers on scene. |
|---|---|
| 8:32.27-8:32.29 | Lieutenant Smith identifies Peacock as "wearing a green shirt." |
| 8:32.48-8:32.58 | Sergeant Hogan requests help. |
| 8:33.10-8:33.14 | Lieutenant Smith repeatedly commands Peacock to drop his weapon. |
| 8:33.15 | Lieutenant Smith shoots Peacock. |
| 8:33.23-8:33.26 | Sergeant Hogan gives first notification to Dispatch, "Central, shots fired. Have EMS rolling." |
| 8:33.33-8:33.36 | Sergeant Hogan gives second notification to Dispatch, "Central, shots fired. Have EMS rolling." |
| 8:33.38 | Dispatch confirms, "10-4." |
| 8:34.26-8:34.28 | Sergeant Hogan once again tells Dispatch, "Go ahead and roll 'em [EMS], 10-18."[5] |
| 8:36.26-8:36.32 | Sergeant Hogan states to Dispatch, "Shots been fired. We got a subject down out here. Just need to get some folks [EMS] out here." |
| 8:37.04-8:37.07 | Sergeant Hogan states to Dispatch, "I have my car out here with my lights on. You'll be able to see us." |
| 8:37.10-8:37.13 | Sergeant Hogan's patrol car parked on roadside in front of property, with blue lights flashing. |
| 8:37.20-8:37.21 | Dispatch radios for "Bleckley-7." |
| 8:37.22-8:37.24 | Sergeant Hogan responds, "Go ahead, Central." |
| 8:37.43-8:37.46 | Dispatch seeks instructions as to "where they [EMS] need to stage at?" |
| 8:37.48-8:37.49 | Sergeant Hogan says, "They can come up to the house, Central." |

---

[5] Police use "10-18" as an "urgent call for assistance." *Reed v. City of Lavonia*, 390 F. Supp. 2d 1347, 1353 (M.D. Ga 2005).

| | |
|---|---|
| 8:37.53-8:37.57 | Dispatch responds, "10-4, you also need EMS on scene or just to stage?" |
| 8:37.58 | Lieutenant Smith, overhearing Dispatch's question tells Sgt. Hogan, "On scene." |
| 8:37.59-8:38.01 | Sergeant Hogan then tells Dispatch, "We need 'em [EMS] on scene, Central. We have a subject down out here." |
| 8:38.05-8:38.06 | Sergeant Hogan tells Lt. Smith, "I done told 'em [Dispatch] that." |
| 8:38.26-8:38.26 | Sergeant Hogan states, "You [Lt. Smith] told him [Peacock] to put it [Peacock's weapon] down." |
| 8:39.51 | EMS, apparently having arrived at the property, is told, "Come on." |
| 8:40.20 | EMS vehicle is visible at the front of the property. |
| 8:40.51 | A second EMS vehicle arrives at the property. |
| 8:42.18-8:42.53 | Sergeant Hogan discusses the events with his chief. |
| 8:42.54-8:42.55 | EMS personnel can be seen tending to subject. |
| 8:43.08-8:43.37 | Body Cam footage shows EMS personnel actively attending to subject's injury. Sergeant Hogan confirms that the identity of subject is not yet known. |
| 8:43.47-8:44.09 | EMS personnel continue to render medical treatment to subject. |
| 8:45.18-8:45.28 | EMS personnel can still be seen on site. |
| 8:46.23 | Sergeant Hogan returns to his patrol car. |
| 8:47.26 | Body Cam Video ends. |

Because Peacock had been seriously wounded and because Defendants failed to *personally* provide any degree of emergency aid or medical treatment to him while waiting for EMS to arrive, Plaintiffs allege that Defendants' inaction constitutes a deliberate indifference to the rights and medical needs of Peacock. [Doc. 1-1, at pp. 10-11, ¶¶ 25, 27, 29].[6]

---

[6] The Plaintiffs did not bring a claim for excessive force related to the shooting.

## **DISCUSSION**

### A.    **Standard of Review**

Federal Rule of Civil Procedure 12(c) provides, "After the pleadings are closed—

but early enough not to delay trial—a party may move for judgment on the pleadings."

Fed. R. Civ. P. 12(c). Such judgments are appropriate when the pleadings present no

disputed material facts, and the movant is entitled to judgment as a matter of law. *Douglas*

*Asphalt*, 541 F.3d at 1273 (11th Cir. 2008). Federal Rule of Civil Procedure 12(b)(6)'s

motion-to-dismiss standard—"whether the [complaint] states a claim for relief"—also

applies to motions made under Rule 12(c). *Strategic Income Fund, L.L.C. v. Spear, Leeds &*

*Kellogg Corp.*, 305 F.3d 1293, 1295 n.8 (11th Cir. 2002) (explaining that standard under both

Rule 12(b)(6) and 12(c) is "whether the count state[s] a claim for relief"). When ruling on

a motion to dismiss for failure for state a claim, the court must view the allegations of the

complaint in the light most favorable to the nonmoving party and consider the well

pleaded allegations of the complaint as true. *Quality Foods de Centro Am., S.A. v. Latin Am.*

*Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983).

In applying this standard, a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6) should not be granted unless the plaintiff fails to plead enough facts

to state a claim to relief that is plausible, and not merely just conceivable, on its face. *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007). "While a complaint attacked by a Rule

12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citing *Sanjuan v. Am. Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)) (internal citations omitted). Further, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Lastly, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *American Dental Ass'n v. Cigna Corp.*, 605 F. 3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682)). With the foregoing standard in mind, the Court rules as follows.

**B. <u>Defendants' Motion for Judgment on the Pleadings [Doc. 5]</u>**

Defendants' motion is premised on four general arguments: (1) Plaintiffs' allegations against Defendants, in their official capacities, are subject to Eleventh Amendment Immunity; (2) Defendants, in their individual capacities, are protected by qualified immunity; (3) Plaintiffs cannot recover punitive damages against Defendants; and (4) Plaintiffs are not entitled to attorney's fees.

1.    Eleventh Amendment Immunity

First, Defendants contend that they are, in their official capacities, entitled to Eleventh Amendment Immunity. [Doc. 5-1, at p. 3]. However, Plaintiffs' Response [Doc. 11] makes short work of this issue. In their Response, Plaintiffs state that "it is because Defendants are entitled to Eleventh Amendment immunity as to any official capacity claims that Plaintiffs[] chose to only assert claims against them in their individual capacities." [Doc. 11, at p. 4].[7]

While the body of the Complaint encompasses both individual and official capacity claims, the Complaint's caption clearly only names "Lt. Christopher Smith and Sgt. Robert Hogan, *in their individual capacities* as Deputies of the Bleckley County Sheriff." [Doc. 1-1, at p. 1 (emphasis added)]. Nevertheless, pursuant to Plaintiffs' Response, it is clear that Plaintiffs did not and do not intend to assert any official capacity claims against Defendants. [Doc. 11, at p. 4]. Thus, this ground is rendered moot.

2.    Qualified Immunity

Next, Defendants argue that they are entitled to qualified immunity as to Plaintiffs' § 1983 claim. [Doc. 5-1, at p. 4]. "In actions brought under 42 U.S.C. § 1983, the doctrine of qualified immunity offers complete protection for government officials whose

_____

[7] According to Defendants, they only raised the defense of Eleventh Amendment immunity because Plaintiffs made official capacity claims in their Complaint. [Doc. 12, at p. 2]; *see also* [Doc. 1-1, at pp. 7-8, ¶¶ 7-8 ("Said Defendant is being sued in his individual and *official capacity* as a Deputy Sheriff of Bleckley County, Georgia.") (emphasis added)].

conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams ex rel. J.W. v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1258 (11th Cir. 2018) (quoting *White v. Pauley*, 137 S. Ct. 548, 551 (2017)). In order to be entitled to qualified immunity, an official must first show that he was acting within his discretionary authority when the allegedly wrongful acts occurred. *Williams*, 904 F.3d at 1258 (11th Cir. 2018). After the defendant makes that initial showing, the burden shifts to the plaintiff to demonstrate that qualified immunity should not be granted. *Id.* To satisfy this burden, "[t]he plaintiff must show (1) that the defendant violated one of his constitutional rights, and (2) that the right was *clearly established* at the time of the wrongful conduct." *Id.* (citing *Valderrama v. Rousseau*, 780 F.3d 1108, 1112 (11th Cir. 2015) (emphasis added)).

Plaintiffs "do not dispute that Defendants were acting within their discretionary duty." [Doc. 11, at p. 4]. Therefore, the narrow question before the Court is whether Defendants' "fail[ure] to provide emergency first aid and medical care and treatment to [] Peacock" violates a clearly established constitutional right. [Doc. 1-1, at p. 12, ¶ 31]. "To determine whether a right is clearly established, we ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Williams*, 904 F.3d at 1259 (11th Cir. 2018) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir.

9

2002) (recognizing that "fair and clear notice" is the cornerstone of the qualified immunity

analysis)).[8]

In this case, Plaintiffs base their § 1983 constitutional violation claim on

Defendants' alleged failure to provide adequate medical treatment[9] and "deliberate

indifference to render and/or obtain medical assistance" after Lt. Smith shot Peacock.

[Doc. 11, at p. 5]. The Due Process Clause of the Fourteenth Amendment requires officers

to provide medical care to those who have been injured while being apprehended. *City

of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244-45 (1983).

---

[8] In *Williams*, the Eleventh Circuit reiterated three ways to evaluate whether a right is clearly established. First, a plaintiff can point to a materially similar case decided at the time of the relevant conduct by the Supreme Court, the Eleventh Circuit, or the Georgia Supreme Court. 904 F.3d at 1259 (11th Cir. 2018). This first method looks at the relevant case law at the time of the alleged violation that would have made it obvious to the officer that his actions constituted a violation of federal law. *Id.* (citing *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017)). *Williams* also notes that "[t]he prior case law need not be directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *White*, 137 S. Ct. at 551).

Second, a plaintiff can identify a broader, clearly established principle that should govern the novel facts of the situation. *Id.* (citing *Gaines*, 871 F.3d at 1208).

Third, a plaintiff can show that the conduct at issue so obviously violated the Constitution that prior case law is unnecessary. *Id.* at 1259-60 (citing *Gaines*, 871 F.3d at 1208). Under this third method, a plaintiff must establish that the conduct "lies so obviously at the core of what the alleged constitutional amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law." *Id.* (citing *Fils v. City of Aventura*, 647 F.3d 1272, 1291 (11th Cir. 2011)). This case does not fall within any of the above-mentioned categories.

[9] The standard to evaluate a failure to provide adequate medical treatment is the same under the Eighth and Fourteenth Amendments. *Keith v. DeKalb Cty.*, 749 F. 3d 1034, 1044 n.35 (11th Cir. 2014). Accordingly, the Court looks to Eighth Amendment deliberate indifference standards when analyzing Plaintiffs' claim. [Doc. 11, at p. 6 (citing *McDowell v. Brown*, 392 F.3d 1283, 1290 n.8 (11th Cir. 2004))].

To be certain, viable inadequate medical treatment claims "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff must show (1) an objectively serious medical need, (2) deliberate indifference to that need, and (3) an injury caused by the defendant's wrongful conduct. *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007); *see also Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (quoting *Estelle*, 429 U.S. at 104). Pertinent to the facts of this case, neither side contests that Peacock had an objectively serious medical need. [Docs. 5-1, at p. 6; 11, at p. 7]. However, Defendants dispute Plaintiffs' contention that they were deliberately indifferent to that serious medical need. [Doc. 5-1, at p. 6].

In making their respective arguments, the parties agree [Docs. 5-1, at p. 6; 11, at p. 7] that to establish deliberate indifference on behalf of the Defendants, Plaintiffs must present

> evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence.

*Valderrama*, 780 F.3d at 1116 (11th Cir. 2015); *see also Goebert*, 510 F.3d. at 1327 (11th Cir. 2007) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). Once the "objectively serious need" is established, in order for the plaintiff to prevail on a claim of

deliberate indifference, the defendant's response must constitute "an objectively insufficient response to that need." *Taylor*, 221 F.3d at 1258 (11th Cir. 2000).

In this case, Plaintiffs made no allegation that Defendants attempted to prevent Peacock from receiving medical treatment from EMS. [Doc. 11, at p. 8]. Instead, their purported constitutional violation arises from "the officers simply standing around[,] looking at a man lying on the ground after being shot by one of the officers, observing that the man is dying, . . . yet making no effort to sustain the man's life." [*Id.*]. It is apparent that Plaintiffs—resting on *Valderrama*'s holding that "the delay in care is, itself, . . . a constitutional violation"—argue that Defendants' mere alerts to "have EMS rolling" are insufficient to "absolve" Defendants of liability. 780 F.3d at 1116 (11th Cir. 2015); *see also* [Docs. 4, at 8:33.24-8:33.37; 11, at p. 10]. To the contrary, Defendants contend that their responsive actions following the shooting were not "objectively insufficient" to Peacock's serious medical need.[10] [Doc. 5-1, at p. 7 (citing *Taylor*, 221 F.3d at 1258)].

Recently, the United States District Court for the Middle District of Alabama discussed facts strikingly similar to those in this case. *Davis v. Edwards*, No. 3:16-cv-855-CDL-DAB, 2017 WL 6544847 (M.D. Ala. Sept. 5, 2017). While the district court decided

---

[10] Again, "[b]ecause the risks associated with a gunshot wound are obvious, the evidence that each officer knew [Peacock] had been shot is sufficient to establish that each officer had subjective knowledge of the substantial risk of serious harm . . . ." [Doc. 11, at p. 7 (citing *Valderrama*, 780 F. 3d at 1116)]; *see also* [Doc. 12, at p. 3 ("It is undisputed that Defendants had subjective knowledge of a substantial risk of serious harm from a gunshot wound . . . .")].

*Davis* in 2017 (after the events in this case), and its decision is in no way binding on *this* Court, the factual comparisons are sufficiently parallel to warrant some degree of discussion. In *Davis*, the plaintiff, as the administrator of the decedent's estate, brought suit against the law enforcement defendants for constitutional violations resulting from a fatal shooting. *Davis*, 2017 WL 6544847, at *1. The plaintiff in *Davis* alleged that after the defendants shot the decedent, they "failed to take the most simple and obvious actions to stop . . . [decedent's] loss of blood, stood by, [and] did nothing to effectively stop . . . the bleeding as [the decedent] bled to death." *Id.* at *8. The *Davis* defendants submitted that they were entitled to qualified immunity because their "conduct d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Like the plaintiff in *Davis*, Plaintiffs in this case cite to *City of Revere* for the proposition that "[t]he Due Process Clause of the Fourteenth Amendment requires government officials to provide medical care to individuals who have been injured during apprehension by the police." [Doc. 11, at p. 6]. However, in *City of Revere*, the United States Supreme Court held that the City "fulfilled its constitutional obligation by seeing that [a wounded pretrial detainee like Peacock] was taken promptly to a hospital that provided the treatment necessary for his injury." 463 U.S. at 245. The Supreme Court did not suggest that the apprehending officers were obligated to render medical

assistance on the scene. *See Davis*, 2017 WL 6544847, at *8. Following the precedent set by

the Supreme Court, the district court in *Davis* held that "there is no clearly established

constitutional obligation to be trained[11] in or to provide medical care. Thus, there is no

constitutional violation in failing to render medical aid." *See id.*

Moreover, in *Valderrama*, the Eleventh Circuit reiterated that it is "clearly

established . . . that an official acts with deliberate indifference when he intentionally

delays providing . . . access to medical treatment," and, "when officers intentionally delay

*seeking* treatment for a life-threatening injury, they act with deliberate indifference." 780

F.3d at 1121 (emphasis added). The unconstitutional three-and-a-half-minute delay in

*Valderrama* stemmed from the officers' choice to discuss the shooting and Mr.

Valderrama's injuries in order to "concoct a story that would justify [the] use of deadly

force" rather than "immediately calling an ambulance for Mr. Valderrama."[12] *Id.* at 1117-

18.

This case presents highly distinguishable facts: eight seconds after Lt. Smith shot

Peacock, Sgt. Hogan notified dispatch, ". . . Shots fired. Have EMS rolling." [Doc. 4, at

---

[11] Plaintiffs' Complaint lacks any assertion that Lt. Smith and Sgt. Peacock received any formal emergency medical training to equip them with the skills necessary to render appropriate aid. *See generally* [Doc. 1-1, at pp. 3-13].

[12] *Valderrama* also discusses the fact that the reporting officer told dispatch that Mr. Valderrama suffered a laceration as opposed to a gunshot wound. 780 F. 3d 1108, 1117 (11th Cir. 2015). The Court noted the vast difference in the degree of severity between the two injuries and how lacerations would receive the "lowest priority level," thereby causing the ambulance to arrive even later. *Id.* at 1118.

8:33.23-8:33.36]. Clearly, the Defendants did not delay *in seeking* treatment for Peacock's injury. Likewise, Defendants Smith and Hogan's actions are easily distinguishable from two of the defendants' actions in *Valderrama*. 780 F.3d at 1117-18. Those *Valderrama* defendants delayed seeking medical treatment for their own benefit—to make up a story to justify their use of deadly force on Mr. Valderrama. *Id.* at 1118. Here, Sgt. Hogan, after reassuring Lt. Smith of his presence, immediately called for EMS after hearing the gunshot. [Doc. 4, at 8:33.21-8:33.35]. Sergeant Hogan, *before* summoning medical treatment, did not even discuss the events occurring just moments before the calls for EMS. Further, Sgt. Hogan never interfered with his body camera, prevented sounds from being recorded, or did anything to cause the Court to believe he (or Lt. Smith for that matter), in any way, thwarted the seeking of medical treatment for Peacock. In fact, as shown in the chart, Defendants repeatedly called for EMS and took every action to assist EMS in finding their location and getting help to Peacock as quickly as possible.

Assuredly, the Court recognizes and understands Plaintiffs' contention that because Defendants Smith and Hogan did not immediately personally render aid to Peacock between the time of the shooting and EMS arrival, they were deliberately indifferent. [Doc. 11, at p. 10]. However, such an obligation on behalf of officers—like Defendants Smith and Hogan—is simply not required by binding legal precedent. As Defendants argue, "[u]nder the record in this case, it is not sufficiently clear that every

15

reasonable official would understand that what Defendant did was unlawful." [Doc. 12, at p. 7].[13] "[O]fficers are not required to be creative or imaginative in drawing analogies from previously decided cases." *Valderrama*, 780 F.3d at 1112.

Therefore, the question is whether "the state of law gave [] officers 'fair warning' that their conduct was unconstitutional." *Id.* at 1113 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). For the simple reason that Plaintiffs do not show that the state of the law (in July of 2016) recognized an injured individual's clearly established right to have immediate medical treatment rendered by police officers themselves, *in addition to* having professional medical treatment sought, there is no "fair warning" that Defendant Smith and Hogan's actions were unconstitutional. *Id.* at 1112-13. Additionally, because neither the Supreme Court, Eleventh Circuit, nor the Georgia Supreme Court have ever distinctively held that an officer must personally render aid to an injured individual, in addition to calling for professional medical help, the Plaintiffs have failed to identify any such clearly established right that Defendants violated.

To the extent Plaintiffs, through their arguments, attempt to persuade the Court to establish such a constitutional right for Peacock, the Court—as a district court—lacks the authority to create such a right. Thus, because no binding courts have ever held that police officers are required to personally render aid to injured persons, in addition to do

---

[13] To the contrary, Defendants absolutely complied with the clearly established precedent that required law enforcement officers to summon medical aid for those injured.

immediately summoning EMS, Defendants are entitled to qualified immunity and Plaintiffs' claim fails as a matter of law.

3.      <u>Punitive Damages and Attorney's Fees</u>

Given the Court's ruling on Defendants' motion, Plaintiffs' claim for punitive damages is likewise dismissed. Additionally, Plaintiffs concede that their claim for attorney's fees cannot stand independent of their underlying § 1983 claim. [Doc. 11, at p. 11]; *see also Estes v. Tuscaloosa Cty, Ala.*, 696 F.2d 898, 901 (11th Cir. 1983) ("Section 1988 authorizes attorney's fees as part of a remedy for violations of civil rights statutes; it does not create an independent right of action."). Therefore, Plaintiffs' claim for attorney's fees is also dismissed in light of the Court's ruling.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Defendants' Motion for Judgment on the Pleadings [Doc. 5].

**SO ORDERED**, this 31st day of October, 2018.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**